J-S22039-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| P.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| P.R. | : | |
| | : | |
| Appellant | : | No. 13 MDA 2019 |

Appeal from the Order Entered November 27, 2018
In the Court of Common Pleas of York County Civil Division at No(s):
2016-FC-001495-03

BEFORE:   SHOGAN, J., DUBOW, J., and PELLEGRINI*, J.

MEMORANDUM BY PELLEGRINI, J.:                **FILED MAY 29, 2019**

P.R. (Father) appeals from the order entered on November 27, 2018, that granted the petition filed by P.L. ("Mother") seeking to modify the existing child custody order entered April 11, 2017, regarding the parties' son, W.R. ("Child"), born in April 2015, and seeking permission for Mother to relocate to Texas with Child.  We affirm.

Mother and Father have never married.  After Child was born, Mother, Father and Child resided with Maternal Grandfather.  Following the ending of Mother and Father's relationship in December 2015, Father moved to Paternal Grandmother's home and had an informal shared 50/50 week on/week off/week schedule, but in December 2015, conflict and neglect issues immediately arose due to Father's lack of care during his custody.  *See* R. 50.

_____
*   Retired Senior Judge assigned to the Superior Court.

## I.

## A.

Mother then filed a complaint for shared legal and primary physical custody. By order dated April 11, 2017, Mother was granted sole legal custody and primary physical custody subject to Father's rights of supervised partial physical custody. Father was required to identify a responsible adult supervisor and was granted supervised custody on alternating weekends for eight hours on Saturday and eight hours on Sunday. He was also granted time on Christmas day from 12:00 p.m. to 6:00 p.m. and four hours of time on Child's birthday each year. In the order, regarding the enumerated offenses pursuant to 23 Pa.C.S. § 5329, the court indicated in relation to justifying the supervised custody rights that: "Father has a 2014 conviction for possession of a controlled substance, and has found to be abusive of Mother in a 2016 Protection from Abuse Action." No appeal was taken from that order.

## B.

In the spring of 2018, Mother's fiancé secured employment in Texas and she desired to relocate there with Child. To be able to do so, she had to comply with the provisions of 23 Pa.C.S. § 5337. Under that provision, a party seeking to relocate does not make an initial filing with the trial court but rather sends by certified mail to every other party with custody rights a notice of relocation in accordance with subsection 5337(c). In addition to the other

information, a subsection 5337(c) notice must contain (1) a proposed revised custody schedule, and (2) a counter-affidavit in the form set forth in subsection (d). A party receiving a 5337(c) notice who objects either to the relocation or to the terms of the proposed revised custody schedule must complete the counter-affidavit included in the notice and file it with the trial court within 30 days. When the trial court receives a counter-affidavit containing an objection either to the relocation or to the proposed revised custody schedule, pursuant to section 5337(g), it must hold an expedited full hearing before the relocation occurs unless it finds that exigent circumstances require approval of the relocation prior to an expedited full hearing.

The trial court then must consider the ten factors listed in subsection 5337(h) setting forth a number of specific factors to insure that all relevant factors are considered. Because a relocation request normally involves a change in the custody order, the trial court can modify any existing custody order if it serves the best interests of the child. 23 Pa.C.S. § 5338. Section 5328(a) in turn sets forth a list of 16 factors that must be considered in a "best interest of the child" analysis in making any custody determination. 23 Pa.C.S. § 5328(a). When a party files a petition for modification of a custody order, the trial court must perform a "best interests of the child" analysis considering all of the section 5328(a) factors.

**C.**

As required by 23 Pa. C.S. § 5337, Mother sent Father the Notice of Relocation on May 31, 2018, but Father did not respond. On September 19, 2018, again pursuant to that provision, Mother filed the Petition for Modification and Relocation and the trial court scheduled a hearing on November 20, 2018. Father appeared at that hearing and opposed the relocation. He contended that he did not receive notice of the proposed relocation.

At the hearing, the trial court first heard evidence concerning the service of the relocation letter. Mother presented the testimony of Katharine Marteny, the paralegal for the law firm representing Mother who prepared the notice of relocation and mailed it to Father. *See* R. 7-8. She testified that she sent the notice via certified and first-class mail on May 31, 2018, to [a certain address,] York, Pa., given to her by Paternal Grandmother and that she received the signed certified mail "green card" on June 2, 2018. Also, the first-class mail was never returned. Paternal Grandmother confirmed at trial that her son [Father] did, in fact, live at that address at the time in question and that she had provided Mother with that information. Father later disputed that was his signature. The trial court elected to go forward with the hearing.

In support of her request, Mother testified that she sought the 2017 custody order because she was concerned with care of Child while he was in the custody of Father because when he was returned to her, he had matted

- 4 -

hair, diaper rash and was not clean. She also testified that Father spoke to her in a threatening manner, and recounted one incident of physical abuse while they were in Las Vegas when she was pregnant with Child.

She then went on to testify that prior to her request to relocate, Father had no physical custody rights until he found an approved supervisor and the supervisor filed an Affidavit of Supervisory Accountability with York County Court of Common Pleas. *See* R. 29. From April 2017 until November 20, 2018, Father failed to obtain a supervisor for his custodial time. Father never sent a card or present to Child and only responded to one of Mother's emails regarding the health and welfare of Child. *See* R. 26. She stated that she was informed that Father "saw" Child on two occasions during the time of April 2017 until November 2018, but both of those occasions were by "accident" when Child was in the care of Paternal Grandmother. *See* R. 75-76. She testified that Father made no attempt to have contact with Child for the 17 1/2 months following the last custody trial.[1] Mother testified that for six to eight weeks, she wrote weekly email updates, but except for one instance, he never responded so that she stopped sending them. *See* R. 41. Mother also acknowledged that she had not provided Father with any notification of

_____

[1] Paternal Grandmother testified that she was not an approved supervisor for Father at the time of the accidental visits. In any event, Paternal Grandmother testified that she was estranged from Father because he was not fulfilling his obligations to Child but they had somewhat reconciled and she would serve as a supervisor.

doctor's appointments since June 2017 and that she stopped emailing Father regarding Child at approximately the same time. *See* R. 41-42.

Mother testified that her fiancé was employed in York County as a car salesman on commission making approximately $60,000 per year. *See* R. 38. In his new position in Texas, Mother's fiancé was employed as a territorial manager for a tobacco company with a salary of $60,000 per year and with much better benefits. *See* R. 39. She indicated that she was not working while living in York County and was still not working or enrolled in any college or post-secondary education after moving to Texas. *See* R. 39. She indicated that the rent that she and her fiancé were paying in York County was approximately $1,250 per month, and that the rent at their new residence in Houston was $1,350 per month. *See* R. 42.[2]

Mother stated that she had an informal arrangement with Paternal Grandmother for her to see Child each week from Thursday afternoons to Friday afternoons from May 2017 through the hearing in November 2018. *See* R. 40-41. She stated that Paternal Grandmother would be an appropriate supervisor for Father's visits. *See* R. 41. She also acknowledged that all of her family resided in York and that some of her fiancé's cousins live in Texas.

_____

[2] Mother's fiancé, S.W., Jr., also testified that he took the position in Texas as a territorial manager for a tobacco company; while at the same salary that he earned on commission as a car salesman, it had much better benefits - a car, a phone and tuition aid to pursue a master's degree as well as a chance for advancement.

In opposition, Father testified that he would like to reestablish his relationship with Child but he would be unable to do so if Child was in Texas because he does not have the financial resources to pay for round-trip tickets to Texas on a regular basis throughout the year. He indicated his income in the last year was approximately $24,000-$30,000. He stated that after the custody hearing, Mother indicated that she did not want him around her or Child. As to his inability to secure a supervisor, he stated that he and his mother were not on speaking terms immediately after the April 2017 order and his only other viable alternative, his brother, had his own legal issues which would have precluded him being appointed as a supervisor. *See* R. 86-87. Father testified that Mother had no issue with him providing care for Child when they were living together and for the year after separation when they shared custody on a 50/50 basis. *See* R. 92-93. Father submitted to a drug test shortly prior to the custody trial for amphetamines, cocaine, marijuana, opiates and PCP which he offered as an exhibit without objection at trial showing all negative results. *See* R. 95-96, 154.[3] He also stated that the signature on the "green card was not his signature." *See* R. 85.

---

[3] Father presented the testimony of his paramour with whom he resides, M.M. *Id.* at 63. M.M. testified that she was an ambulance dispatcher and was prepared to act as a supervisor on those visits. She also stated that Child could stay at her one-bedroom apartment.

It was stipulated that there was no finding of abuse pursuant to the Protection from Abuse Order, as it was entered by agreement without an admission of the acts alleged in the petition. **See** R. 80. Father's criminal history was also introduced and showed that he pled guilty to possession of drug paraphernalia pursuant to 35 P.S. § 780-113(a)(32) on June 16, 2014, and received probation, all of which predated Child's birth by ten months. **See** R. 81-82, 146-151.

### D.

At the conclusion of the hearing, the trial court read its order into the record, granting the petition for modification and permitting Mother to relocate with Child to Texas. **See** R. 106-108. The trial court addressed on the record its findings in detail as to each of the custody's best interest factors set forth in 23 Pa.C.S. § 5328(a)[4] and the ten relocation factors set forth in 23 Pa.C.S.

---

[4] Section 5323(d) provides that a trial court "shall address the sixteen [Section 5328(a) custody] factors on the record in open court or in a written opinion or order before the deadline by which a litigant must file the notice of appeal." **C.B. v. J.B.**, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." **J.M. v. M.L.G.**, 63 A.3d 331, 336 (Pa. Super. 2013).

§ 5337(h)[5]. *Id.* at 108-118. Its reasoning was later supplemented by an extensive 1925(a) opinion.

Regarding whether notice had been served on Father as required by 23 Pa.C.S. § 5337(c), the trial court found that Father was not credible in claiming that he did not receive Mother's notice of relocation and that Father failed to timely object to Mother's relocation with Child within 30 days as required by 23 Pa.C.S. § 5337(d).

Regarding custody, the trial court order was substantially the same as the April 11, 2017 order except that Paternal Grandmother was approved as a supervisor as soon as she filed an affidavit of supervisor and that Mother and Father share the cost of transportation of Child as well as approving contact by Facetime or the equivalent. *See* R. 106-108.

On December 21, 2018, Father timely filed his appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(ii).[6]

_____

[5] Section 5337(h) also mandated that the trial court shall consider the ten relocation factors listed therein, giving weighted consideration to those factors affecting the safety of the child. Moreover, like section 5323(d), the trial court should delineate its reasoning at or near the time of its relocation decision. *A.M.S. v. M.R.C.*, 70 A.3d 830 (Pa. Super. 2013).

[6] "In reviewing a custody and relocation order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to

**II.**

On appeal, while Father lists four issues in his brief, as his brief makes clear, he is making two basic challenges to the trial court's decision. His core challenge is that trial court erred in determining that Mother met her burden of proof required by 23 Pa.C.S. § 5337 to justify her request for relocation from Pennsylvania to Texas. He also challenges the trial court's custody order by not giving him more extended custody periods rather than alternative weekends as well as not approving unsupervised time with Child.

**A.**

Before addressing those issues, we must address Mother's claim that the hearing should not have proceeded once the trial court found that Father was served and he did not timely respond to her notice. 23 Pa. C.S. § 5337 provides in relevant part:

(d) Objection to proposed relocation.—

\* \* \*

(3) If notice of the proposed relocation has been properly given and no objection to the proposed relocation has been filed in court, then it shall be presumed that the

---

the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." **C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

- 10 -

nonrelocating party has consented to the proposed relocation.

(4) If a party who has been given proper notice does not file with the court an objection to the relocation within 30 days after receipt of the notice but later petitions the court for review of the custodial arrangements, **the court shall not accept testimony challenging the relocation.**

(e) Confirmation of relocation.—If no objection to the proposed relocation is filed under subsection (d), the party proposing the relocation shall file the following with the court prior to the relocation:

(1) an affidavit stating that the party provided notice to every individual entitled to notice, the time to file an objection to the proposed relocation has passed and no individual entitled to receive notice has filed an objection to the proposed relocation;

(2) Proof that proper notice was given in the form of a return receipt with the signature of the addressee and the full notice that was sent to the addressee.

(3) a petition to confirm the relocation and modify any existing custody order; and

(4) a proposed order containing the information set forth in subsection (c)(3).

(g) Hearing.—

(1) Except as set forth in paragraph (3), the court shall hold an expedited full hearing on the proposed relocation after a timely objection has been filed and before the relocation occurs.

(2) Except as set forth in paragraph (3), the court may, on its own motion, hold an expedited full hearing on the proposed relocation before the relocation occurs.

Under these provisions, where no timely objection has been filed, the trial court may approve the proposed relocation and custody order without a

hearing, but, if it so desires, can order a hearing but should not accept evidence challenging the proposed relocation. Whether a party who fails to timely object has standing to appeal a discretionary hearing is an open question, and because standing is not jurisdictional and no one has raised it as an issue, we decline to address it here.

Nonetheless, as did the trial court in its Rule 1925(a) opinion, we will review the issues Father raises on appeal.

**B.**

Father argues that the trial court erred as a matter of law and abused its discretion in determining that Mother had met her burden of proof for relocation with Child to Texas by ignoring the uncontroverted evidence from the hearing. However, that claim is belied by the extensive findings the trial court made at the conclusion of the relocation hearing, as well as its Rule 1925(a) opinion, where it extensively and cogently explains the factors and the reasoning for approving relocation.

In its Rule 1925(a) opinion, the trial court then set forth its analysis of the relocation factors as follows:

> We adopt and incorporate our analysis of the relocation factors, which we dictated on the record at the conclusion of the trial, as if fully set forth herein. As to our holding that Mother had met her burden of proof, there is substantial evidence to support our conclusion that she had. Further, we were utterly unconvinced by Father, [sic] that he had any intention whatsoever of building a loving, stable relationship with the child.

* * *

- 12 -

With respect to relocation, the [court] must first consider the nature, quality, extent of involvement and duration of the child's relationships with the party proposing to relocate and with the non-relocating party, siblings, and other significant persons in the child's life. It is undisputed that Father has not seen the child in nearly a year and a half, except by accident. Again, Mother has a loving, nurturing, stable relationship with the child. Father has no relationship with the child. Although Paternal Grandmother has maintained an important relationship with the child, this factor weighs heavily in favor of Mother.

Next, the [court] is to consider the age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child. The child is only three[;] thus[,] this factor is difficult to weight, other than to say that the child has known no other parent than Mother, and heretofore she has been able to meet the child's needs. Father presented no evidence why she would be any less capable in Texas. This weighs toward Mother.

Next, the [c]ourt considers the feasibility of preserving the relationship between the non-relocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties. The non-relocating parent has no relationship with the child, and[,] thus[,] there is no relationship to preserve. This favors Mother and relocation.

The next relocation factor is the child's preference. Due to his being three-years [sic] old, we cannot ask the child definitively. Thus, it is given no weight.

The [c]ourt must next consider whether there is an established pattern of conduct by either party to promote or thwart the relationship of the child and the other party. Mother has ensured that [P]aternal [G]randmother continues to play a role in the child's life, despite her son's disinterest, and this factor favors relocation.

Next, the [c]ourt is to consider whether the relocation will enhance the general quality of life for the party seeking

- 13 -

the relocation, including, but not limited to, financial or emotional benefit or educational opportunity. Mother testified that the desire to relocate was prompted by her long-time paramour's more lucrative employment situation existing in Texas. We found Mother to be credible and genuine, and[,] thus[,] this factor favors relocation.

Next, the [c]ourt is to consider whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity. Mother's improved financial situation will spill over into benefits for the child, and this factor favors relocation.

The reasons and motivation of each party for seeking or opposing relocation is the [c]ourt's next consideration. We found Mother's testimony that she was seeking a better life for her family to be completely credible. Father's testimony that he wanted to re[-]establish a connection with his son was completely not credible. Thus[,] this factor favors relocation.

The next relocation factor is present and past abuse. While we recognize that abuse was a consideration in the earlier stages of this custody litigation, as evidenced by the protection from abuse order, we do not find this to be a relevant factor, currently.

Factor then allows the court to consider any other relevant factor; we find that there is no other relevant factor.

Finally, Father complains that the final order in custody is confusing and vague. For clarification, Mother has primary physical custody, subject to Father's rights of partial, supervised custody. Father may exercise his custodial periods on alternating weekends, for eight hours Saturday and eight hours Sunday. These periods may be exercised either by Father travelling to Texas, or in the event that Mother brings the child to Pennsylvania for some other, unrelated purpose.

The analysis of the relocation factors that the trial court dictated on the record at the conclusion of the trial and incorporated into it 1925(a) opinion included:

> The first relocation factor is the nature, extent, involvement, and duration of the child's relationship with the mother[,] who is proposing to relocation and with the father who is remaining in the York, Pennsylvania area.

> This factor is in favor of relocation as [M]other has been pretty much the sole custodian of this child for at least a year and a half. We cannot help but notice that [F]ather took this matter to court and had a full trial on April 11, 2017, then claiming that he wanted substantial custodial rights of his child, and immediately thereafter doing nothing to actually pursue and have any custodial rights with [Child]. It is significant that this father has seen this child twice since the April 11, 2017 order and both of those were by accident.

> Candidly, one of the reasons why the April 11, 2017 decision was made was because at that time [F]ather's testimony was disingenuous and not credible and the [c]ourt found then that his efforts to say he wanted to have custodial rights with his son seemed not genuine and/or poorly motivated. Father's testimony today is no improvement on that testimony he gave back then and we find him equally not credible.

> He has all kinds of excuses as to why he did not receive the relocation notice and counterclaim. While we believe [M]other properly served that on him, we nevertheless held a full relocation hearing and are finding the facts in this case based on the relocation factors.

> The second relocation factor is the age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development. This factor is[,] at the very worst[,] neutral, insofar as the child is only three years of age. The child knows the mother and her significant other who is[,] in effect[,] a stepfather to be his family. He does recognize [P]aternal [G]randmother as a big part of his life, but she is not a party to this. And [M]other has made arrangements for this child to see [P]aternal [G]randmother

substantially. And therefore, there is no detrimental effect on the child's physical, educational, and emotional development from this relocation.

The third factor is the feasibility of preserving the relationship between the non-relocating party and the child through suitable custody arrangement. This is a huge factor in most relocation cases and is also a huge factor in his case. While [F]ather testified that this relocation will make it difficult for him to reunify with his son[Child], that is not how this relocation factor is worded. It is worded the feasibility of preserving the relationship, implied preserving the existing relationship between the non-relocating party and the child. There is little or no relationship between this child and the non-relocating party, his father.

If [F]ather had done what he was supposed to do back in [sic] April 11, 2017, and he obtained a supervisor and he saw his son on alternating weekends, this might be a completely different case. The bottom line is the feasibility of preserving an almost non-existent relationship is high. And therefore, this factor favors relocation. Maybe the fact that this child now lives 1500 miles away from the father will spur the father onto [sic] actually try to be a father.

The fourth factor is the child's preference. The child is four – I'm sorry, three. Because of his age, we did not interview him. He's too young to express a factor [sic]. So that is a non-factor.

The fifth factor is whether there is an established pattern of conduct of either party in promoting or forging the relationship of the child and the other party. The father did see this child twice in the last year and a half by accident through his mother. And the mother of the child, relocating party in this matter, knew that, did not bring a contempt proceeding, which she could have since there was no approved supervisor, and in fact, the mother has encouraged the paternal grandmother to have a relationship with this child. And therefore, there is an established pattern of the mother to actually promote the relationship between the child and the father. And therefore, this is another factor in favor of relocation.

Factor Number 6 is whether the relocation will enhance the general quality of life for the mother. We find that it does. The

uncontroverted testimony of [M]other and her live-in fiancé is that his career opportunities are greatly increased by taking this job in Houston, Texas. And while he makes approximately the same income, his benefits are significantly better, including a company car and a company reimbursement for cell phone and other things. And further, [M]other's fiancé has greater opportunities for promotion and more pay increases as a result of the relocation. Therefore, this is also a factor in favor of relocation.

Factor Number 7 is whether the relocation will enhance the general quality of life for the child. While that is always a bit speculative, there is no reason to believe in this case that the relocation will be anything but enhancing the general quality of life for the child since his mother and her live-in fiancé are in a much better place financially and that will, of course, spill over into being a benefit factor for [Child]. Therefore, we find even this factor is in favor of relocation.

Factor Number 8, the reasons and motivation of each party for seeking or opposing the relocation. We find [M]other's motivation for seeking the relocation is a very good one. Father believes she's just trying to get away from him and/or the York area. We have heard nothing to support that speculation on [F]ather's part. We tend to believe [F]ather's motivation for opposing the relocation is either because his mother is actually the one opposing the relocation and/or the father is just making life difficult for the mother, which[,] quite frankly[,] he's got a history of doing. So this is another factor in favor of relocation.

Factor Number 9 is the present or past abuse committed by a party or member of [a] party's household when there is a continued risk of harm to the child or abused party. While we took into account[,] back in 2017, the original trial, that [F]ather had abused [M]other and that there was a PFA order, candidly, we find at this point there is no real risk of harm to the child or the mother[,] as that has become fairly old history. Therefore, this is a non-factor.

Factor 10 is any other factor, and we find no other factor.

*See* R. 108-113.

It is obvious from these findings that the trial court analyzed and weighed each factor in arriving at its decision regarding relocation. Father claims that the trial court did not consider the cost of travel for him to maintain contact with Child which we agree would certainly weigh against relocation,[7] but, in this case, there was no contact to maintain because Father had absolutely no involvement with Child in the year-and-a-half since April 2017 preceding the custody hearing in November 2018, with the exception of two accidental visits at the home of Paternal Grandmother.

Father also contends that the trial court ignored certain evidence when considering the factors regarding relocation. He asserts that aside from minimal fringe benefits and increases that Mother's fiancé would receive from his new employment in Texas, there was no other readily discernible benefit to the relocation, and that the trial court failed to consider that the rent in Texas would be a $100 more per month. However, the trial court found that Child's general quality of life will be enhanced by Mother's fiancé, and, even though he will make the same income, the benefits are much better and he has greater opportunities for promotion and more pay increases as a result of the relocation. The trial court also noted that Mother stated that she would make efforts to continue the relationship with Paternal Grandmother after the relocation. In his brief, Father opines that it is also nonsensical and illogical

---

[7] **See S.J.S. v. M.J.S.**, 76 A.3d 541 (Pa. Super. 2013).

to allow Mother to sever the tie between Child and Paternal Grandmother which obviously existed and which could provide a conduit by which Father could reestablish his relationship with Child. That argument assumes that Father will continue not to be estranged from his mother—Paternal Grandmother. In any event, the testimony indicated that Mother made efforts to continue the relationship with Paternal Grandmother after the relocation.

While Father may complain about the weight the trial court gave to certain factors than to others, that is a judgment that the trial court has to make in determining what is in the best interest of Child's well-being, not what the Father wants. Accordingly, because there is ample evidence to support the trial court's findings, we find that there was not abuse of discretion by the trial court to enter an order allowing relocation.

**C.**

While not challenging directly the trial court's custody findings, Father contends that the trial court abused its discretion by giving him partial supervised physical custody only on an alternating weekend basis for eight hours on a Saturday and eight hours on a Sunday. He contends that given the distance and cost involved, there should been given longer periods of time rather than alternative weekends, as well as exercising some unsupervised rights of contact, or alternatively, to provide for some avenue by which Father could exercise unsupervised rights of contact in the future. The trial court's

reasoning for the custody arrangements and not allowing unsupervised visits are intertwined.[8]

At the conclusion of the November 20, 2018 trial, when counsel questioned whether Father would continue to be required to be supervised in light of the fact that the court did not find the paraphernalia conviction to be significant, the court indicated: "He has to have supervision because, number one, the child may have no idea who he is. Number two, he did not get a 5329 [threat of harm] evaluation. Number three, I don't find him to be credible. I don't find him to be reliable. As I indicated, he has been found in contempt once. I just don't think the child is safe until at least there is a 5329 evaluation and/or there is a time where he spends with his child over a period of time." *See* R. 119-120.

In the trial court's 1925(a) opinion regarding the continuation of supervision, the court indicated: "Father's third alleged error attacks the supervision requirement of the order, as well as the lack of a roadmap for Father to navigate in order to arrive at unsupervised custody. Simply, there

---

[8] In his brief, Father cites ***J.R.M. v. J.E.A.***, 33 A.3d 647 (Pa. Super. 2011), for the holding in that case that, in the absence of a determination that the child would suffer a detrimental impact by having unsupervised visits with the non-custodial parent, the trial court should have entered an order granting unsupervised periods of partial custody for the noncustodial parent. Father's Brief, at 16. In the present appeal, however, the trial court adequately explained its determination that Child would suffer a detrimental impact by having unsupervised custodial time with Father, the noncustodial parent, who had a history of drug abuse, and with whom Child has virtually no contact.

is no evidence on the record that awarding Father unsupervised custody is in the child's best interest. During the first round of custody proceedings, Father's potential drug use was a concern, as was the possibility of abuse. Thus, a threat of harm evaluation was ordered. To date it has not been completed." *See* 1925(a) Opinion, at 11, Appendix "B".

Given those findings regarding unsupervised visits, while Father might desire the order to provide for additional custodial time with Child, the trial court more than adequately explained its reasons for not doing so and allowing Mother to relocate with Child. Moreover, the trial court tried to ameliorate Father's concerns regarding the reality of partial physical custody when the parties live 1500 miles apart by allowing Facetime with his Child on a regular basis as well as see Child in Texas. Also, at the hearing, testimony was provided that Mother would be in York, Pennsylvania, every three to four months, and if Father had a supervisor, this would allow Father an opportunity to see Child as provided in the order. *See* R. 44-45, 122.

Simply, there is no evidence on the record that awarding Father unsupervised custody or extended custody is in Child's best interest and the trial court more that adequately explained its reasons for so ordering. Accordingly, because the trial court's conclusions do not involve an error of law, and are not unreasonable as shown by the evidence of record, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/29/2019